**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BATHSHEBA N. HODGE,<br><br>Plaintiff,<br><br>v.<br><br>FADY SABA, *et al.*,<br><br>Defendants. | Case No. 24-cv-2247-MJS |

# MEMORANDUM OPINION

After working for several months as a server at L'Avant-Garde—a French restaurant in Washington, D.C.—Plaintiff Bathsheba Hodge told management she was pregnant. Soon after, one of Hodge's managers allegedly began mistreating her. Believing that mistreatment was due to her pregnancy, Hodge raised a complaint along those lines with the restaurant's general manager. And soon after that, as Hodge tells it, management retaliated against her for making that complaint, including by allegedly terminating her employment. Hodge then proceeded to file this lawsuit claiming unlawful discrimination, retaliation, and harassment under both federal and District of Columbia law. With discovery in the case closed, the remaining defendants now move for summary judgment on Hodge's remaining claims. For the reasons that follow, the Court holds that Hodge's claim under D.C.'s Protecting Pregnant Workers Fairness Act ("PPWFA") and her hostile-work-environment claim (Counts II and VI) fail as a matter of law and undisputed fact, but the Court concludes that genuine disputes of material fact preclude summary judgment on Hodge's other claims of discrimination and retaliation (Counts I, III, IV, and V). So, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion (ECF No. 42 ("Mot.").).

## FACTUAL BACKGROUND

The following facts are either undisputed or construed in favor of Hodge as the non-moving party. Fed. R. Civ. P. 56(a); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And, as a *pro se* litigant, Hodge's filings are "liberally construed." *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 392 (D.C. Cir. 2020) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).[1]

In January 2023, Hodge started as a server at L'Avant-Garde, a French restaurant owned by Ezekiel Entertainment, LLC and located in the Georgetown neighborhood of Washington, D.C. (Defs.' Stmt. ¶¶ 2–3.) At all relevant times, Fady Saba was L'Avant-Garde's general manager with overall control over staffing, scheduling, and hiring and firing. (*Id.* ¶ 4; Pl.'s Stmt. ¶ 4.)[2]

In June 2023, Hodge learned she was pregnant. (Pl.'s Stmt. ¶ 8.) Not long after, in early July 2023, Hodge was hospitalized for several days due to pregnancy-related complications, and she missed several days of work as a result. (Defs.' Stmt. ¶ 11; Pl.'s Stmt. ¶ 11.) Around that same time, L'Avant-Garde hired a new Service Director, Samuel Holley, who became one of Hodge's managers. (Defs.' Stmt. ¶¶ 9–10; Pl.'s Stmt. ¶¶ 9–10.) In connection with her July 2023 absences, Hodge texted with Holley about her medical issues, including to communicate that her health and the health of her "unborn" was important to her; Holley approved those absences. (ECF No. 44-2 at 72–78 ("Hodge Decl.") ¶¶ 22–23; ECF No. 44-2 at 31, Pl.'s Ex. 6.)

---

[1] Per the Court's Local Rules, Defendants' motion was accompanied by a separate statement of material facts (ECF No. 42-2 ("Defs.' Stmt.")), and Hodge submitted a response to Defendants' statement to assert various factual disputes, in most instances accompanied by a reference to supporting evidence (ECF No. 44-1 ("Pl.'s Stmt.")). In describing the evidence for purposes of this ruling, the Court generally cites to one of those statements—Defendants' version if the fact is expressly undisputed or at least not genuinely disputed by Hodge, and Hodge's version where she creates a genuine factual dispute. In some places, though, the Court cites directly to the supporting evidence itself, including Hodge's declaration and other exhibits—especially given Hodge's *pro se* status and the Court's obligation to construe her filings liberally.

[2] Although the parties quibble over Saba's official title—Defendants use "general manager" (Defs.' Stmt. ¶ 4), while Hodge says he was the "operator/owner" of L'Avant-Garde (Pl.'s Stmt. ¶ 4)—that dispute is not material because all agree he was the highest-ranking authority at the restaurant, whatever his actual title.

Hodge returned to work on July 11, and, during that first shift back, Holley verbally disciplined her for violating new rules for servers that Holley had implemented while Hodge was absent from work. (Defs.' Stmt. ¶¶ 12–13; Pl.'s Stmt. ¶¶ 12–13; Hodge Decl. ¶¶ 27–29.) A few days later, Holley met with Hodge to explain the new rules and to apologize for "getting off on the wrong foot." (Defs.' Stmt. ¶¶ 14–15.) From Hodge's perspective, though, things did not improve. (Pl.'s Stmt. ¶ 15.) On that score, Hodge describes a private event that L'Avant-Garde hosted on July 20—an event Hodge expected to staff as one of the more experienced servers. (Defs.' Stmt. ¶¶ 16–17; Pl.'s Stmt. ¶¶ 16–17.) Instead, Holley assigned her to handle the restaurant's other tables—reportedly more than a dozen—while simultaneously training a relatively new server. (Pl.'s Stmt. ¶¶ 18–19.) Hodge was so busy that shift, she explains, that she was unable to "rest, drink water, or use the restroom," and she went home feeling so sick and exhausted that she slept through the beginning of her shift on July 21. (Hodge Decl. ¶¶ 43–46.) Holley then "cut" Hodge from her scheduled shift the following day, July 22. (*Id.* ¶ 48.)

Frustrated with the state of things, Hodge sent Saba a lengthy email on July 22 to raise a complaint about feeling "harassed" and "singled out by" Holley. (Defs.' Stmt. ¶ 21; ECF No. 44-2 at 45, Pl.'s Ex. 8.) In concluding, Hodge wrote: "I feel as though Samuel has been singling me out, and he does not feel like I am fit to be an employee at your establishment because I am pregnant." (Pl.'s Ex. 8 at 48.) She added: "I feel like work is starting to become a hostile environment because Samuel wanted to initially fire me, and now he's just trying to find a reason." (*Id.*)

Saba wrote a brief response on July 23, congratulating Hodge on her pregnancy and committing to respond more fully after speaking with Holley. (Defs.' Stmt. ¶ 24; ECF No. 42-10,

Defs.' Ex. 8.) A few days later, Hodge was surprised to learn her weekly shifts had been reduced significantly from five shifts to two. (Hodge Decl. ¶ 53; ECF No. 44-2 at 55, Pl.'s Ex. 10.)

On July 27, Saba sent a more substantive response to Hodge's complaint. (Defs.' Stmt. ¶ 25; ECF No. 44-2 at 50, Pl.'s Ex. 9.) In broad strokes, Saba essentially attributed any issues between Holley and Hodge to miscommunication and misunderstandings, and Saba told Hodge that L'Avant-Garde hired Holley to help take the restaurant's service "to a much higher level," including by implementing new performance expectations and rules for staff. (Pl.'s Ex. 9.) Saba closed his message by summarizing his sense of the situation: Hodge "wanting to work for L'Avant-Garde"; "L'Avant-Garde aiming to improve and make huge technical efforts"; and Hodge's "absences due to [her] pregnancy sickness." (*Id.*) Saba then offered a bullet-point "solution to make [her] work with [L'Avant-Garde] much easier": "[l]et [him] know when [she was] fully in shape and hopefully soon"; "[a]ccept [Holley] as [her] service director and communicate with him"; and "[a]ccept the change in [L'Avant-Garde's] Management style … and do [her] best to succeed in these new requirements." (*Id.*) Saba closed his message as follows:

> I wish I could answer you more than that. I wish you didn't have to go through all the pain in the first days of your pregnancy but I also believe that we have staff/scheduling/service requirements that need to be met.
>
> If this is not the best time, I would appreciate that you let me know and you'll be always welcome to join the Team, with its improved style of service, whenever you feel 100% well.
>
> I'd [be] happy to meet with you in person and explain my point if my French translation to English leads to any misunderstanding.

(*Id.* at 51.)

Saba did meet with Hodge in person toward the end of Hodge's shift the following day, July 28. (Defs.' Stmt. ¶ 26; Hodge Decl. ¶ 66.) The parties offer differing accounts of what Saba said during that meeting, at least in material part. Everyone agrees that Saba told Hodge he wished

he had somewhere for Hodge to sit while working and that she should return to work when she was "100% well again." (ECF No. 42-5 at 2, Defs.' Ex. 3; ECF No. 44-2 at 10–11, Pl.'s Ex. 2 ¶¶ 18, 22.) More, everyone agrees Saba did *not* use the words "terminated" or "fired" at any point. (ECF No. 45-1 at 5, Defs.' Reply Stmt. ¶ 27.) According to Hodge, though, when Saba told her to return when "100% well again," he added the phrase "after the baby"—*i.e.*, she should come back to work when she was "100% well again *after the baby*"—which Hodge took to mean she was being terminated because of her pregnancy. (Hodge Decl. ¶ 68.) Saba denies saying "after the baby" and claims he instead assured Hodge that she "should not go anywhere else" because he wanted to "keep her on staff." (Defs.' Ex. 3 at 2.) And more broadly, Saba denies any intent to terminate Hodge during that meeting. (Pl.'s Ex. 2 ¶¶ 18, 21.)

After the meeting, Hodge finished up with her remaining tables and left the restaurant. (Hodge Decl. ¶ 72; Defs.' Reply Stmt. ¶ 28.) The restaurant's scheduling software still showed Hodge on the schedule for July 29, August 2, and August 4, but Hodge did not work any further shifts. (Defs.' Reply Stmt. ¶¶ 29, 31, 35, 39–40.) Hodge acknowledges as much but says she did not report to work because she believed she had been fired. (Pl.'s Stmt. ¶¶ 29, 31, 35, 39–40.) Defendants insist the evidence shows otherwise, including based on text messages between Hodge and another manager, Robert Rooney. (Mot. at 15.) On July 29, for instance, Rooney texted Hodge, "You good?" and "I called out but I guess you did too?" (Defs.' Stmt. ¶ 32.) Hodge did not respond. (*Id.* ¶ 33.) Rooney texted Hodge again on August 2, and Hodge wrote back, in relevant part, "I just feel like [L'Avant-Garde] didn't really want me there anymore," and "I don't want to stay at a place like that. Just too much stress[.]" (ECF No. 42-13 at 4, Defs.' Ex. 11.)

L'Avant-Garde did not schedule Hodge for any shifts after August 4. (Defs.' Reply Stmt. ¶ 40.) Defendants do not point to a date on which L'Avant-Garde separated Hodge's employment—

though it surely did so at some point—other than to say generally (and in passive voice) that "it could be asserted that Plaintiff's termination occurred on or after August 4, 2023 because she was no longer scheduled to work after that date." (Mot. at 20; ECF No. 45 ("Reply") at 5 ("[T]he most reasonable inference for Plaintiff's termination date would be the week of August 7, 2023[.]").)

## LEGAL STANDARDS

Federal trial courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In the D.C. Circuit's words, "[s]ummary judgment is merited only if, after 'viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in her favor.'" *Latture v. Priority Life Care, LLC*, 189 F.4th 1213, 1222 (D.C. Cir. 2026) (quoting *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1172 (D.C. Cir. 2021)). At this stage, courts do not "weigh the evidence and determine the truth of the matter but instead determine [only] whether there is a genuine issue for trial." *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1371 (D.C. Cir. 2020) (citations and quotation marks omitted). "The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.*

## ANALYSIS

Hodge continues to press five claims for relief against Ezekiel, Saba, or both: gender discrimination under the D.C. Human Rights Act ("DCHRA") (Count I); pregnancy discrimination under the PPWFA (Count II); retaliation under the DCHRA (Count III); pregnancy and sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") (Counts IV and V); and

hostile work environment under Title VII (Count VI). (*See generally* Am. Compl.)[3] Because Defendants seek summary judgment across the board, the Court addresses each of Hodge's remaining claims below, albeit not necessarily in the same order presented in her complaint.

## I. Hodge's PPWFA Claim

Start with the PPWFA claim. (Am. Compl. ¶¶ 52–55.) The PPWFA prohibits employers from "[r]efus[ing] to make reasonable accommodations to the known limitations related to pregnancy" and from "[t]ak[ing] an adverse action against an employee who requests or uses a reasonable accommodation." D.C. Code § 32-1231.03(1), (2). Claims under the PPWFA are subject to a one-year statute of limitations. *Id.* § 32-1231.06. Relevant here, the Court already dismissed Hodge's PPWFA claims against the individual defendants as time-barred in ruling on Defendants' Rule 12(c) motion. *See Hodge*, 2025 WL 2959745, at *6–7. Defendants did not seek dismissal of the PPWFA claim against Ezekiel at that time, but they reprise the same statute-of-limitations argument to do so now. The Court's earlier analysis applies straightforwardly here, too. Because Hodge filed her lawsuit more than a year after the last allegedly unlawful act supporting her PPWFA claim, and because the PPWFA does not provide for administrative tolling, *see id.*, the Court agrees with Defendants that Hodge's remaining PPWFA claim against Ezekiel is likewise subject to dismissal as untimely. The Court grants summary judgment accordingly.[4]

---

[3] Pursuant to Rule 12(c), the Court previously dismissed: Hodge's PPWFA claim against Saba and Holley (Count II); her Title VII claims against Saba and Holley (Counts IV–VI); her DCHRA claims against Holley (Counts I and III); and her claim based on D.C. Municipal Regulations altogether (Count VII). *See generally Hodge v. Saba*, 2025 WL 2959745 (D.D.C. Oct. 17, 2025). And because that ruling disposed of all claims against Holley individually, the Court dismissed Holley as a named defendant at that time.

[4] Given this holding, the Court need not reach Defendants' alternative argument that the PPWFA claim separately fails because Hodge never requested any accommodation(s). (Mot. at 27; *see also* Reply at 9-10.)

## II. Hodge's Title VII Hostile-Work-Environment Claim

Next up, Hodge's "harassment" claim under Title VII, which Defendants aptly construe as a claim for hostile work environment based on her pregnancy. (Am. Compl. ¶¶ 68–71; *see* Mot. at 23.) To prevail on a hostile-work-environment claim, Hodge must prove she was subject to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment[.]" *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). Plus, Hodge must show the hostile treatment was based on a protected characteristic—under the theory here, her pregnancy. *Cf. Hammel v. Marsh USA Inc.*, 206 F. Supp. 3d 219, 239–40 (D.D.C. 2016) (granting summary judgment where plaintiff "produced no evidence that any hostile actions allegedly taken … were made *because* [she] was pregnant").

Defendants seek summary judgment on the basis that Hodge cannot show that the allegedly harassing conduct was severe or pervasive. (Mot. at 25–26.) As they frame things, Hodge's claim rests on allegations that Holley, over the course of a few weeks: (1) blamed Hodge for leaving a dirty plate on the bar and accused her of lying about it; (2) told Hodge, in front of guests, that she was taking too long to complete an order and argued with her about which dishes were vegetarian; (3) assigned Hodge shift assignments that did not reflect her experience as a senior server; and (4) did not staff Hodge to work a private event and instead overloaded her with other tables while she trained a new server. (*See id.*) These interactions, Defendants maintain, cannot be found to have subjected Hodge to an "abusive working environment" as a matter of law. (*Id.* at 23.) For her part, Hodge fails to respond to this argument—or even really address her "harassment" claim at all (*see generally* ECF No. 44 ("Opp'n")—even though the Court expressly cautioned that if Hodge "addresse[d] only certain arguments raised by the defendant[s], [the] court may treat those

arguments that [she] failed to address as conceded" (*see* Order, ECF No. 43). As forewarned, Hodge's silence on this point operates as a concession. And even absent concession, the Court agrees that the conduct alleged is not sufficiently severe or pervasive to support a viable claim for the reasons Defendants explain. The Court thus grants summary judgment on Count VI.

### III. Hodge's Title VII and DCHRA Discrimination Claims

Turn next to Hodge's discrimination claims. Specifically, Hodge asserts that Defendants discriminated against her based on her sex under the DCHRA (Count I) and based on her sex and pregnancy under Title VII (Counts IV and V). (Am. Compl. ¶¶ 48–51, 60–67.)[5]

"Title VII prohibits discrimination by an employer against 'any individual' based on that individual's 'race, color, religion, sex, or national origin,'" and "[t]he DCHRA contains a similar provision." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) (first quoting 42 U.S.C. § 2000e–2(a)); then citing D.C. Code § 2–1402.11(a)). Under Title VII, moreover, discrimination on the basis of sex expressly encompasses discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k); *see Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 n.1 (D.C. Cir. 2013); *Mulkerin v. Bunch*, 2021 WL 3771806, at *2 n.4 (D.D.C. Aug. 25, 2021) (explaining Congress's amendment of Title VII through passage of the Pregnancy Discrimination Act to clarify this point).

Courts analyze discrimination claims under Title VII and the DCHRA using the same legal framework. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015); *Brandli v. Micrus Endovascular Corp.*, 709 F. App'x 7, 8 (D.C. Cir. 2017) ("[A] discrimination claim under the DCHRA is analyzed in the same way as a federal discrimination claim under Title VII[.]") (citations omitted). In cases premised on indirect evidence of discrimination—as the briefing from

[5] Hodge's DCHRA claim is against both Ezekiel and Saba, whereas her Title VII claims are against Ezekiel only. *See Hodge*, 2025 WL 2959745, at *4 (dismissing the Title VII claims individual defendants).

both sides presupposes here—courts apply the familiar burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016); *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006). The plaintiff bears the initial burden of establishing a *prima facie* case, which requires showing that "she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Wheeler*, 812 F.3d at 1113–14 (citation omitted). "[T]he burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 1114. And from there, it falls "to the plaintiff … to show that the employer's stated reason for its actions was in fact pretext for unlawful discrimination." *Id.* (citation omitted); *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) ("Proof of illicit motive is essential, and the employee at all times has the burden of proving that the defendant intentionally discriminated against her.") (citation and quotation marks omitted).[6]

Because the burden-shifting framework aims to progressively "sharpen the inquiry into the elusive factual question of intentional discrimination," courts sometimes employ a "shortcut" in the analysis. *Figueroa*, 923 F.3d at 1086–87 (citation and quotation marks omitted). If the employer "properly presents a legitimate, nondiscriminatory reason," then courts generally "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Id.* at 1087 (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). Instead, courts focus on

---

[6] The Court considered whether Saba's alleged remark that Hodge could return to work when she was "100% well again after the baby" might give rise to a theory of *direct evidence* of discrimination. *See Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (defining direct evidence as evidence "that itself shows ... bias in the employment decision") (citing *Ayissi–Etoh*, 712 F.3d at 576). But for at least two reasons, the Court declines to engage on that potential theory. One, Hodge does not press a direct-evidence argument in her briefing. Even acknowledging her *pro se* status, the Court still believes it important to adhere to the principle of party presentation and will not independently raise discrete arguments on Hodge's behalf. And two, the Court finds—for the reasons explained below—that Hodge's discrimination claims survive summary judgment under an indirect-evidence theory, which suffices to resolve the instant motion.

"whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Wheeler*, 812 F.3d at 1114 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)). "But if an employer contests whether the plaintiff suffered a sufficiently adverse action to sustain a discrimination or retaliation claim, it is appropriate to consider first whether the plaintiff has made a prima facie case." *Webster v. Spencer*, 2020 WL 2104231, at *8 (D.D.C. May 1, 2020) (citing *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008)).

Here, Defendants attack Hodge's discrimination claims on multiple fronts. At the first step, Defendants argue that Hodge cannot even establish a *prima facie* case because she did not suffer any cognizable adverse employment action, whether an employment termination or otherwise. And at the second and third steps, they argue that Hodge failed to adduce sufficient evidence from which a jury could find their nondiscriminatory explanation for her alleged termination to be a pretext for unlawful discrimination. The Court addresses each argument in turn.

**A. Adverse Action**

Defendants' lead argument is that Hodge did not suffer any cognizable adverse action. (Mot. at 14–19.) They devote the bulk of their briefing on this point to arguing that the record precludes any finding that Hodge's employment was terminated during her July 28 meeting with Saba. (*Id.* at 14–17.) Defendants separately contend that none of the other incidents Hodge complains about was an adverse action as a matter of law. (*Id.* at 18–19.)

On the current record at summary judgment—construing the facts in the light most favorable to Hodge, as required—the Court believes that a reasonable jury could find that Defendants subjected Hodge to an adverse employment action on July 28, 2023.

Start with the question of whether the evidence could reasonably support a finding that Defendants *terminated* Hodge on July 28. According to Hodge's sworn declaration, Saba told her that she could return to work when she was "100% well again after the baby." (Pl.'s Stmt. ¶ 27; Hodge Decl. ¶ 68.) From that alleged comment, Hodge "understood that she was not permitted to work while pregnant" (Opp'n at 6) and "that [she] had been terminated" (Hodge Decl. ¶ 71). Insisting otherwise, Defendants highlight several points in response. They stress the fact that Saba never used the terms "fired" or "terminated" during the July 28 meeting, and they highlight that Saba told Hodge she "should not go anywhere else." (Reply at 3–4.) They also point out that Hodge remained on the schedule for several shifts after July 28—at least according to L'Avant-Garde's software—and that another manager, Robert Rooney, messaged Hodge to check on her when she did not show up for at least one of those shifts. (Mot. at 14–15.) These are not unreasonable arguments, and a jury might ultimately credit them to conclude that Hodge was not terminated on July 28. But in the present posture under Rule 56, Hodge gets the benefit of the doubt when it comes to construing the facts and drawing inferences from those facts. And the Court cannot say that Defendants' counterpoints—in and of themselves—squarely preclude a finding in Hodge's favor on this point. *Cf. Cloutier v. City of Lowell*, 2017 WL 11488633, at *23 n.17 (D. Mass. July 12, 2017) (similarly assuming a plaintiff was discharged when the summary judgment evidence showed the "plaintiff was told that she could return to [work] when she healed"). After all, managers are sometimes uncomfortable having frank and difficult discussions with employees and might use less-than-direct language to communicate a termination decision; and the fact that Hodge was still showing up on the electronic schedule for a few shifts beyond July 28, and that

another manager (not Saba) reached out to Hodge about her status in the days that followed, are susceptible to plausible alternative explanations beyond Hodge remaining employed.[7]

In short, even though Defendants press several credible counterpoints to the idea that Hodge's employment was terminated by Saba on July 28, the Court cannot say that no reasonable jury might side with Hodge on that question. And that itself is enough to create a triable issue of fact on the existence of a cognizable adverse action as alleged by Hodge.

Further, even if the Court were to agree that the evidence foreclosed a finding that Hodge's employment was *terminated* on July 28 (and the Court does not so find), that would not mean Hodge did not suffer *any adverse action* coming out of that meeting. At a minimum, a reasonable jury could interpret Saba supposedly telling Hodge she could return to work when she was "100% well again after the baby"—which, again, is how Hodge describes things—as L'Avant-Garde placing Hodge on forced leave from work, with no scheduled shifts and no pay, until after her pregnancy. (*See* Opp'n at 8 (arguing that Defendants "effectively removed her from active employment," whether they used the word "terminated" or not).) A forced and unpaid leave of absence, while obviously short of outright termination, still constitutes an adverse action in this context. *See, e.g.*, *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 135 (D.D.C. 2009) ("[P]lacement on unpaid leave status constitutes a materially adverse employment action.")

---

[7] As to L'Avant-Garde's scheduling software, in particular, Hodge argues—and Defendants essentially concede—that the schedule often changed after being posted to "capture real-time managerial directives." (Opp'n at 9; Reply at 5.) And based on the existing evidentiary record, the Court understands the relevant schedule to have been prepared by L'Avant-Garde management *before* the July 28 meeting, not afterward, such that Hodge's appearance on an already-existing schedule would not be obviously inconsistent with Hodge's theory that Defendants terminated her employment on July 28. Similarly, as to Rooney's texts, the Court does not view that evidence to be as clear-cut as Defendants suggest. In one instance, Rooney tells Hodge that he was "checking on" her "as [a] friend" and "[a]s Bob not as a mngr," which tends to belie any business-related purpose for his outreach, such as asking after an absent employee. (Defs.' Ex. 11 at 2–3.) And other than the text messages themselves, Defendants do not proffer any testimony from Rooney—whether deposition excerpts or a declaration—that attests to some understanding or belief on his part that Hodge was not terminated on July 28 and remained employed past that date.

(citation omitted); *see also Krempasky v. Hendricks Rest. Holdings LLC*, 2019 WL 11790570, at *4 (N.D. Ga. June 7, 2019) (finding adverse action under Title VII when employer required a pregnant waitress to take an involuntary leave of absence).

Whether a jury ultimately believes that Hodge was terminated or forced onto unpaid leave on July 28—or neither—would obviously bear on Hodge's potentially recoverable damages and related issues at trial. But for purposes of satisfying the *prima facie* element of an actionable adverse employment action, the first two possibilities suffice at this stage.

**B. Defendants' Proffered Nondiscriminatory Rationale**

Separately, Defendants argue that even if Hodge could show that they terminated her employment with L'Avant-Garde, they had a legitimate, nondiscriminatory reason for doing so: namely, that Hodge "did not show up for three scheduled shifts and did not contact her employer regarding her absences." (Mot. at 20.) In so arguing, Defendants point to the fact that Holley reportedly enacted a "no show policy" prior to Hodge's repeated absences. (*Id.* at 21.)

Broadly speaking, the caselaw rightly recognizes that an employee's unexcused absences can be a legitimate basis for discharge, including in the context of an employee's repeated "no call, no show." *Larry v. Nat'l Rehab. Hosp.*, 973 A.2d 180, 184 (D.C. 2009) ("Clearly, employers have a reason to discharge an employee who does not regularly show up for work[.]"); *see also Gilmore v. Atl. Servs. Grp.*, 17 A.3d 558, 562 (D.C. 2011) ("Claimant's conduct, in the form of no call or no show for three consecutive days, constituted job abandonment[.]") (quotation marks omitted)); *Wilkerson v. Wackenhut Protective Servs., Inc.*, 813 F. Supp. 2d 61, 67–68 (D.D.C. 2011) (finding that employer put forward a legitimate, nondiscriminatory reason for discharge when the plaintiff "did not show up for multiple shifts," amounting to job abandonment). But the problem for Defendants here is that the "no call, no show" justification they put forward *postdates* the adverse

action underpinning Hodge's claim. After all, if, as Hodge contends, Saba fired her on July 28—or put her on forced leave on that date—then Hodge's subsequent absences on July 29, August 2, and August 4 cannot have formed the basis for that earlier July 28 decision. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) ("The employer could not have been motivated by knowledge it did not have[.]"); *cf. State of N.C. v. FERC*, 112 F.3d 1175, 1188 (D.C. Cir. 1997) ("Obviously, a subsequent event cannot be the cause of something that is already in existence."). Under Hodge's theory, Defendants' argument gets the timing backwards.

Otherwise, Defendants do not try to muster any legitimate, nondiscriminatory rationale against the assertion that they terminated Hodge (or otherwise took adverse action against her) on July 28. The Court acknowledges that Defendants plan to defend against Hodge's claims on the basis that she left the July 28 meeting with a "mistaken belief that she was terminated[.]" (Reply at 5.) By Defendants' telling, they did not terminate Hodge on July 28; instead, they maintain that Hodge made a choice to stop showing up for work and essentially abandoned her job without properly communicating with management at L'Avant-Garde. Again, the Court acknowledges that a jury might ultimately side with Defendants on that central question. But because the record reflects a genuine dispute of material fact on that point, and because Defendants do not challenge Hodge's ability to satisfy a *prima facie* case in any other way, the *McDonnell Douglas* framework puts the burden on Defendants to articulate a legitimate, nondiscriminatory reason for the challenged adverse action on July 28. And since Defendants' proffered explanation is tied to an assumptive termination date of August 4 or later—and based on facts that postdate July 28—their proffered explanation is tantamount to no real explanation at all. *See Figueroa*, 923 F.3d at 1094 ("The [employer] having failed to meet his burden, the District Court was required to deny the motion [for summary judgment] as to the disparate treatment claim.").

* * *

For these reasons, the Court denies summary judgment on Counts I, IV, and V.

**C. Hodge's DCHRA Retaliation Claim**

That leaves Hodge's retaliation claim under the DCHRA. (Am. Compl. ¶¶ 56–59.) The DCHRA, in relevant part, prevents employers from "retaliat[ing] against ... any person ... on account of having exercised or enjoyed ... any right granted or protected under this chapter." D.C. Code § 2–1402.61(a). When reviewing DCHRA retaliation claims premised on circumstantial evidence, as here, courts likewise apply the *McDonnell Douglas* burden-shifting framework summarized above. *District of Columbia v. Bryant*, 307 A.3d 443, 457 (D.C. 2024). In the retaliation context, the necessary *prima facie* case requires the plaintiff to demonstrate: "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Gaujacq*, 601 F.3d at 577 (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).

Defendants concede, at least for purposes of summary judgment, that Hodge engaged in protected activity under the DCHRA when she sent her July 22, 2023 email to Saba. (Mot. at 19.) After all, that email expressly voiced a belief that Holley was "harass[ing]" and "singling [her] out" "because [she was] pregnant." (Pl.'s Ex. 8 at 45–48.) Defendants instead seek summary judgment based on the same overall grounds that they used to attack Hodge's discrimination claims: that Hodge did not suffer a cognizable adverse employment action—including because she was not terminated on July 28—and that Hodge cannot show their "no call, no show" explanation for Hodge's employment separation to be a pretext for unlawful retaliation. (Mot. at 19.) And on those arguments, the Court's preceding analysis maps onto the retaliation claim, too.

Simply put, the evidentiary record presently before the Court reflects a genuine dispute of material fact as to whether or not Defendants terminated Hodge's employment on July 28, 2023 (or, alternatively, placed her on a forced leave of absence), which forecloses summary judgment on Defendants' adverse-action argument. And because Defendants' proffered non-retaliatory explanation for Hodge's eventual employment separation—which rests on Hodge's missed shifts on and after July 29, 2023—is not something a reasonable jury could credit in evaluating the legitimacy of an adverse action that assertedly took place days earlier, the Court cannot grant summary judgment for Defendants at the later stages of the burden-shifting analysis.[8]

The Court therefore denies summary judgment as to Count III.

## CONCLUSION

For the reasons explained, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. The Court **GRANTS** summary judgment in Defendants' favor as to Counts II and VI, but it **DENIES** summary judgment as to Hodge's remaining claims in Counts I, III, IV, and V. The Court will issue a separate order so stating.

Dated: November 18, 2026

MATTHEW J. SHARBAUGH
United States Magistrate Judge

[8] Hodge separately says that Defendants retaliated against her by reducing her schedule from five shifts per week to two—a development that followed in the days after her email complaint to Saba. (Opp'n at 14.) In response, Defendants first argue that the reduced schedule "could only be an adverse employment action if Plaintiff was still employed after July 28" (presumably because only then would Hodge have worked the reduced schedule), which is inconsistent with Hodge's core theory of the case. (Reply at 6.) Not so. As the D.C. Circuit has explained, "an adverse employment action becomes cognizable when the employer provides notice of the action to the employee, 'regardless of whether the employer follows through.'" *Van Horn v. Del Toro*, 2024 WL 4381186, at *3 (D.C. Cir. Oct. 3, 2024) (quoting *Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019)). Separately, Defendants say they had a legitimate and non-retaliatory reason for the reduced schedule: Hodge's prior "unplanned and last-minute absences during the month of July." (Reply at 7.) But that argument only surfaced in Defendants' reply, which means Hodge did not have a chance to respond to it. So the Court will not address it now.